**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF ILLINOIS**

**RUSSELL LEO RALPH,**
        **Plaintiff,**

        v.        Case No. 04-1443

**LISA JUMP,**
        **Defendant.**

**ORDER**

    Before the court are the defendant's summary judgment motion [33] and the plaintiff's response [39] and the defendant's reply [41].

**Standard**

    Summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P.56(c); *Outlaw v. Newkirk*, 259 F.3d 833, 837 (7th Cir. 2001), *citing Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986)*; Herman v. National Broadcasting Co., Inc.*, 744 F.2d 604, 607 (7th Cir. 1984), *cert. denied*, 470 U.S. 1028 (1985). In determining whether factual issues exist, the court must view all the evidence in the light most favorable to the non-moving party. *Beraha v. Baxter Health Corp.,* 956 F.2d 1436, 1440 (7th Cir. 1992). Further, this burden can be satisfied by "'showing'–that is, pointing out to the district court–that there is an absence of evidence to support the nonmoving party's case." *Celotex*, 477 U.S. at 325. If such a showing is made, the burden shifts to the non-movant to "set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e); *Outlaw*, 259 F.3d at 837. A nonmoving party cannot rest on its pleadings, but must demonstrate that there is admissible evidence that will support its position. *Tolle v. Carroll Touch, Inc.,* 23 F.3d 174, 178 (7th Cir. 1994). Credibility questions "defeat summary judgment only '[w]here an issue as to a material fact cannot be resolved without observation of the demeanor of witnesses in order to evaluate their credibility.'" *Outlaw*, 259 F.3d at 838, *citing* Advisory Committee Notes, 1963 Amendment to Fed. R. Civ. P. 56(e)(other citations omitted).

    Fed. Rule Civ. Pro. Rule 56(c) "mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex,* 477 U.S. at 322. "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party there is no 'genuine' issue for trial." *Mechnig v. Sears, Roebuck & Co.*, 864 F.2d 1359 (7th Cir. 1988). A "metaphysical doubt" will not suffice. *Matsushita Elec. Industrial Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586 (1986).

Disputed facts are material only if they might affect the outcome of the suit. *First Ind. Bank v. Baker,* 957 F.2d 506, 507-08 (7th Cir. 1992). The mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, *247-248, 106 S.Ct. 2505, 2510 (1986).

## Background

The plaintiff's allegations against defendant Lisa Jump are brought pursuant to *Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics,* 403 U.S. 388 (1971). (R.15,p.1). The plaintiff, an inmate at the Federal Correctional Institution "FCI") in Pekin, alleges that Jump, a nurse at the medical unit at FCI Pekin, violated his Eighth Amendment rights. Specifically, he alleges that the defendant was deliberately indifferent to his serious medical needs in that she failed to provide him with immediate medical care while he was having a stroke.

## Statement of Facts[1]

1. The plaintiff is a federal inmate currently confined at the Federal Correctional Institution in Pekin, Illinois. *See* App.6.
2. The plaintiff arrived at FCI Pekin on October 13, 2001. *See* App.6,47.
3. On October 6, 2003, at approximately 8:40 a.m., the plaintiff was returning to his unit from his job in Recreation. *See* App.18,49,53,54. While he was walking, the plaintiff claimed he lost feeling in the right side of his body, and fell. *See* App.54. According to the plaintiff, another inmate helped him back to the unit. *See* App.54,55.
4. After the plaintiff returned to his unit, he went to his unit officer, Joe Gray, and asked him to call the Medical Unit (hereinafter "Medical") regarding his symptoms. *See* App.56.
5. The plaintiff testified that he told Officer Gray that he "had a stroke." What he testified he meant was that he was currently having a stroke. *See* App.63.
6. What Officer Gray heard was that the plaintiff said he felt like he had the symptoms of having a stroke. *See* App.10. In fact, Officer Gray testified that he asked the plaintiff if he was having symptoms at that moment and the plaintiff replied he was not. *See* App.10.
7. Based on the plaintiff's request, Officer Gray called Medical and spoke with Nurse Jump, the defendant. Gray testified that he told Jump "that inmate Ralph stated that earlier in the day, he felt similar to the way he felt when he previously suffered from a stroke." *See* App.10. Jump asked if the plaintiff was currently having any symptoms and Gray said he was not. Jump then told Gray to have the plaintiff report to Medical at 12:30 p.m. that day. *See* App.10.
8. The plaintiff testified that he does not remember Gray telling Jump that he was currently having a stroke. *See* App.63,64.
9. The plaintiff testified that he was present during the phone conversation between Gray and Jump and that Gray repeated what Jump said during that conversation. The plaintiff testified that Gray told Jump that the plaintiff's right side of his body went dead. Further,

---

[1]Reference to Appendices are attached to the defendant's statement of facts [34].

         the plaintiff claimed that Gray reported Jump said that "if he's had it, there is nothing that I can do for him. If he wants – if he wants to come over at 12:30 and see a PA, he can. That was three hours and 45 minutes later. If he wants – if he wants to come over at 12:30 and see a PA, he can. That was three hours and 45 minutes later." *See* App.60-62.

10. Gray testified that when the plaintiff came into the office he did not appear to be in any distress. Had the plaintiff appeared to be in distress or having symptoms, Gray would have sent the plaintiff immediately to Medical for assessment. *See* App.11.
11. Jump testified that on October 6, 2003, she was working as a triage nurse at FCI Pekin. She received a call from Officer Gray regarding the plaintiff who was not feeling well and she asked about his symptoms. Gray told Jump that the plaintiff had a history of a stroke but was not having any symptoms at the time. *See* App.13.
12. Jump consulted with Physician's Assistant Hansen who instructed Jump to have the plaintiff report to Medical at 12:30 that day. Jump relayed this information to Officer Gray. *See* App.10,13.
13. Gray testified that based on what the plaintiff told him and his own observations of the plaintiff, he was not in need of immediate medical attention. *See* App.11.
14. Jump testified that based upon her conversation with Gray and her consultation with PA Hansen, she did not know that the plaintiff was in need of immediate medical attention. *See* App.13.
15. Instead of going to Medical at 12:30 p.m. on October 6, 2003, as instructed, the plaintiff went to the dining hall allegedly to seek assistance for his condition from the Warden or Health Services Administrator, Eddie Samalio. *See* App.64-66.
16. To explain why he just did not go to Medical over the noon hour to obtain medical assistance rather than go to the dining room, the plaintiff first stated he could "not even walk, let alone stand up to come to the hospital" as he was in such great pain due to an ongoing stroke. *See* App.120.
17. However, the plaintiff's assertion of total incapacity was challenged by Harrell Watts, Administrator National Inmate Appeals, who stated: "You claim you were physically unable to walk to the clinic for the 12:30 appointment on October 6, 2003, yet you went to the dining hall looking for the Health Services Administrative [sic] (HSA) or the Warden to complain about the nurse." *See* App.123. Mr. Watts also observed that the plaintiff received an MRI of the brain on October 30, 2003, which revealed a small hemorrhage in a particular area. Due to its size and location this hemorrhage, there was no evidence that the hemorrhage was related to the symptoms the plaintiff experienced on October 6, 2003. *See* App.21,39,123.
18. Although the plaintiff originally stated that he could not go to Medical on October 6th due to his "great pain" (*see* App.120) he testified that it wasn't until the next day, October 7 that he "started having a little bit of pain." *See* App.57.
19. When testifying in his deposition for this case, the plaintiff said that the reason he went to the dining room to seek help rather than go directly to the clinic was because he wanted to meet with the Warden or Health Services Administrator because the plaintiff thought that the medical staff already turned down his request for assistance. *See* App.65,79.

20. The next day, October 7, 2003, the plaintiff complained of being numb on the right side of

      his body. *See* App.71. The plaintiff did go to the pharmacy in order to get his medications with help, he claims, from a fellow inmate. *See* App.71. However, again the plaintiff did not seek medical attention for his alleged symptoms. *See* App.75. Instead, the plaintiff claims he went again to the dining hall to look for the Warden or Mr. Samalio. *See* App.75. The plaintiff did not find either person on October 7.

21. On October 7, 2003, the plaintiff states that he took two or three aspirin tablets and approximately 10 minutes later he started getting feeling back in his right side. The plaintiff said that he then returned to normal except for some pain in his leg relative to a cramp and he had numbness in that leg from his knee down. *See* App.57,72.
22. On October 8, 2003, the plaintiff did not attempt to go to Medical for his condition. *See* App.36.
23. On October 9, 2003, the plaintiff went to the dining room early and found Mr. Samalio. He told Mr. Samalio of his symptoms and that upon taking aspirin "I said I got all of the feeling back in this -- on the right side of my body." *See* App.78. The plaintiff reports that Samalio said the aspirin dissolved the blood clot. Samalio called Medical and told the plaintiff to go to the unit right away. *See* App.78.
24. On October 9th, when the plaintiff went to Medical he stated he was still numb from his right knee to his right foot. The plaintiff was evaluated for numbness and weakness on the right side of his body. The examination revealed no abnormal neurological finding. *See* App.18,81-82,123.
25. On October 30, 2003, the plaintiff underwent an MRI of his brain. *See* App.21. The impression was "A few small foci of increased T2 signal in the white matter regions which may be due to some small vessel disease. Small focus of increased T1 signal in the left basal ganglia area, adjacent to the left thalamus which may be that of a small amount of hemorrhage in this area. No enhancing lesion seen." *See* App.39,81-82,83.
26. The plaintiff was also evaluated on December 15, 2003. Again, there were no neurological findings noted. *See* App.25-26. The plaintiff indicated he had no foot pain, tingling or numbness - no pain in legs walking or exercising, and no dizziness. *See* App.25.
27. The plaintiff claims that due to his stroke, his leg became numb and that he required physical therapy to walk correctly. Physical therapy was provided. *See* App.31-32.
28. The plaintiff also states that he suffered a "mini-stroke" that lasted a few seconds in May of 2005. There were no lasting physical effects from that episode. *See* App.32.

      Local Rule 7.1(D) provides that all motions for summary judgment, responses and replies thereto shall comply with the requirements of this rule. Any filings not in compliance may be stricken by the court. Th consequences for failing to comply are discussed thoroughly in *Waldridge v. American Hoechst Corp.*, 24 F. 3d 918 (7th Cir. 1994). When filing a response to motion for summary judgment, Local Rule7.1(D)(2) provides that the response shall include the following sections with appropriate headings: (a) Introduction and (b) Response to Undisputed Material Facts. In separate subsections the party must state the following: (1) Undisputed Material Facts, (2) Disputed Material Facts, (3) Immaterial Facts, and (4) Additional Material Facts. In each section, the party must list by number the fact which is conceded to be undisputed and material, disputed, and immaterial and the reason for such claim and any additional material facts, as appropriate. In his response, the plaintiff did not comply with this rule. He only

provides arguments. Therefore, the court finds that the defendants Undisputed Facts have been conceded to by the plaintiff.

## Discussion and Conclusion

Prison officials violate the Eighth Amendment's proscription against cruel and unusual punishment when they display "deliberate indifference to serious medical needs of prisoners." *Estelle v. Gamble*, 429 U.S. 97, 104 (1976). A claim of deliberate indifference to a serious medical need contains both an objective and a subjective component. To satisfy the objective component, a prisoner must demonstrate that his medical condition is "objectively, sufficiently serious." *Farmer v. Brennan*, 511 U.S. 825, 834 (1994)(internal quotations and citation omitted); *see also Walker v. Benjamin*, 293 F.3d 1030, 1037 (7th Cir. 2002). A serious medical condition is one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would perceive the need for a doctor's attention. *See Foelker v. Outagamie County*, 394 F.3d 510, 512-13 (7th Cir. 2005).

To satisfy the subjective component, a prisoner must demonstrate that prison officials acted with a "sufficiently culpable state of mind." *Farmer*, 511 U.S. at 834 (internal quotation and citation omitted). The officials must know of and disregard an excessive risk to inmate health; indeed they must "both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists" and "must also draw the inference." *Farmer*, 511 U.S. at 837. This is not to say that a prisoner must establish that officials intended or desired the harm that transpired. *Walker*, 293 F.3d at 1037. Instead, it is enough to show that the defendants knew of a substantial risk of harm to the inmate and disregarded the risk. *Id*. Additionally, "a factfinder may conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious." *Farmer*, 511 U.S. at 842.

The court will first address the arguments made by the plaintiff in his response. The plaintiff argues that Josef Gray, his unit officer, should have "immediately overrode [sic] Nurse Lisa Jump's misdiagnosed phone conversation and called another more reliable party to whom would carry out the duties of hospital personnel." See response, p. 5. The plaintiff states that "Josef Gray was lax and seemingly also deliberately indifferent now that plaintiff has read his report and affidavit declaration." However, Josef Gray is not a defendant in this lawsuit. Even if had Gray had acted improperly, that does not support the plaintiff's Eighth Amendment claim against Defendant Jump for deliberate indifference.

The plaintiff also argues that Defendant Jump was at fault because she attempted to "evaluate, diagnose, analyze or determine serious medical problems over the phone with a non medical person." See response, p. 6. However, it is clear from the declarations of Jump and Grey that Jump was not trying to make a diagnosis, but was only trying to determine if there was an on-going emergency that needed immediate attention. The defendant was told that the plaintiff was not then presenting any symptoms. See App. 10, 12. The plaintiff did not appear to be in any distress (App. 11); no emergency medical was called (App. 13); and the plaintiff, himself, admitted that he was not then having any pain. See plaintiff's response and Appl. 57, 58. Jump

5

was not attempting to evaluate or diagnose the plaintiff's condition over the telephone, she was trying to determine if the plaintiff required immediate medical attention. Based on the facts before the court, and as discussed below, there did not appear to be any emergency.

Also, even if the plaintiff changes his testimony to claim that he was in pain, there is no evidence that the plaintiff reported any such claims to either Officer Gray or to Defendant Jump. Although the plaintiff is claiming he had an emergency on the morning of October 6, 2003, and was told to report to the medical unit at 12:30 p.m. that day, the plaintiff did not go to the medical unit until October 9, three days after the alleged incident - though he did go to the dining room each day. Defendant Jump was not trying to make a diagnosis but was only trying to determine if there was an on-going emergency that needed immediate attention. The defendant was told that the plaintiff was not then presenting any symptoms; the plaintiff did not appear to be in any distress ; no medical emergency was called; and the plaintiff, himself, admitted that he was not then having any pain. Defendant Jump was not attempting to evaluate or diagnose the plaintiff's condition over the telephone, she was trying to determine if the plaintiff required immediate medical attention. From all the facts presented, there did not appear to be any emergency. The plaintiff is essentially arguing that whenever an inmate reports a medical problem, such as a headache, then the medical staff is required to provide immediate medical attention or risk personal liability because there could be serious underlying problems. Even offering to provide the inmate medical attention within a few hours of the call is insufficient under the plaintiff's theory. The Eighth Amendment's protections are not so large. The plaintiff cannot establish that he actually suffered a stroke or any medical emergency.

What is really at issue here is whether Defendant Jump had sufficient information to know whether the plaintiff was having a medical emergency and then consciously disregarded a potential for serious harm. The plaintiff has not shown that the defendant actually knew of his alleged stroke. The evidence establishes that at the time, the defendant, Jump did not receive sufficient facts to put her on notice that there was a medical emergency, if in fact one existed. Summary judgment is appropriate in favor of the defendant. Under the facts of this case, summary judgment is warranted as the plaintiff is unable to establish that he suffered a substantial risk of harm and, further, he cannot establish that the defendant Lisa Jump knew of and disregarded an excessive risk of harm to the plaintiff.

As stated above, the plaintiff must establish that his medical condition had been diagnosed by a physician or was so obvious that even a lay person would perceive of the need for a doctor's attention. *Foelker*, 394 F.3d at 512. Someone suffering from a stroke would be in need of immediate medical assistance. However, there is no evidence that this was the case here. The plaintiff claims that he suffered a stroke and was continuing to suffer a stroke at the time he spoke to his unit manager, Joe Gray. There is no medical support for plaintiff's claim that he had suffered a stroke. There is some evidence based upon an MRI that he had a small hemorrhage in a particular area of his brain. There is no evidence, however, to support a claim that this hemorrhage related to his alleged symptoms on October 6, 2003. In fact, the facts in this case indicate that the plaintiff did not have a substantial medical emergency at the time that he spoke with Joe Gray on October 6th. According to the plaintiff, he appeared in Gray's office without

6

assistance. Gray testified that the plaintiff did not appear in any distress. Gray also testified that the plaintiff told him that earlier that morning he had experienced symptoms similar to those he had when he had a stroke. The plaintiff's testimony in this regard is ambiguous. He testified that he did not tell Gray that he was currently having a stroke, but that he had a stroke. In fact, the plaintiff states that he never had a stroke before. What the plaintiff intended and what Gray understood are two separate matters. It is clear from Gray's testimony that he was under the impression that the plaintiff was not experiencing stroke-like symptoms at the time of their conversation. What is most important is that Gray testified that he told Jump that the plaintiff was not currently having any symptoms. In response to his call to medical, the plaintiff was told to report to the medical unit at 12:30 p.m. that day. Rather than report to the unit, plaintiff preferred to go to the dining room at that time. While he initially said that he could not go to the medical unit because he could not walk due to his great pain, this was untrue. The plaintiff testified at his deposition that he only had a little pain and that occurred the next day. Further, plaintiff claimed that he did not go to the medical unit because he thought that he would not get proper treatment for his condition. Instead, plaintiff claims that he went to the dining room over the lunch hour to find the Warden or the Health Services Administrator, Mr. Samalio. For three days, the plaintiff postponed going to the medical unit regarding his alleged emergency even though he was told to report to medical within hours of his complaint. On October 9th, after seeing Mr. Samalio, and on Samalio's suggestion, plaintiff reported to the medical unit for the first time. The evaluations that were performed on plaintiff after he went to the medical unit showed he did not have any neurological abnormalities. As the plaintiff has not established the objective component, that is he suffered a serious medical condition that was obvious to even a lay person, the defendant is entitled to summary judgment.

Further, the plaintiff cannot establish that the defendant acted with the requisite mental intent. Even if the plaintiff could establish that he was in substantial risk of serious harm that should have been obvious, he cannot show the subjective component, *i.e.*, that the defendant actually knew sufficient facts to put her on notice that the plaintiff suffered a substantial risk of harm and that she disregarded those facts. The only defendant here is Nurse Lisa Jump and she did not see the plaintiff on October 6. Instead, on October 6, defendant Jump spoke with the defendant's unit manager Gray on the telephone regarding plaintiff's need for medical care. Jump inquired about the plaintiff's symptoms, and Gray reported what he understood to be the facts: that earlier that morning plaintiff experienced symptoms like those he had before when he had a stroke - but, he was not then undergoing these symptoms. Gray testified that he asked the plaintiff if he was currently having those symptoms and the plaintiff said no. According to Gray, the plaintiff did not appear to be in any distress. The plaintiff's statement to Gray concerning his alleged stroke was ambiguous. His statement was interpreted by Gray to mean that plaintiff had a stroke in the past and that morning he had symptoms similar to those he had when he had the stroke. While plaintiff may insist this is not what he intended to convey, this is how Gray understood what plaintiff said. However, even if Gray could be faulted for misinterpreting Ralph's statements, Jump cannot be. Jump could only rely on the information provided to her which was filtered through Gray. Gray reported that the plaintiff was not then undergoing any symptoms. Further, Gray did not believe the plaintiff was at that time in any distress. Gray testified that defendant Jump specifically asked him if the plaintiff was then undergoing any

7

symptoms; Gray said he was not.  Jump similarly testified that she inquired whether the plaintiff was currently having symptoms of a stroke and the plaintiff said no.  Based upon the information provided to her, Jump consulted with Physician's Assistant Hansen who told her to have the plaintiff come into the medical unit for an evaluation at 12:30 p.m. that day.  No one called a medical emergency and at no time during that conversation did Gray inform her that the plaintiff was in need of immediate medical attention.  In fact, rather than go to his scheduled appointment, the plaintiff opted to wait three more days to go to the medical unit.  The plaintiff has not established that defendant Jump acted with a "sufficiently culpable state of mind." *Farmer*, 511 U.S. at 834.  It is not enough that the official or a reasonable person "should have known" of a risk to an inmate.  *Haley v. Gross*, 86 F.3d 630, 641 (7th Cir. 1996).  Instead, deliberate indifference requires actual knowledge by an official of a substantial risk of serious harm.  *Farmer*, 511 U.S. at 837-38.  Simply put, the plaintiff has not shown that Jump had actual knowledge of a substantial risk to his health.  The evidence shows that defendant Jump did not have sufficient information to know that on the morning of October 6, the plaintiff was then involved in an emergency medical situation if, in fact, that is true.

**It is therefore ordered:**

1. **Pursuant to Fed. R. Civ. P.56(c), the defendant's summary judgment motion is granted [33].  The clerk of the court is directed to enter judgment in favor of the defendants and against the plaintiff pursuant to Fed. R. Civ. P. 56.  All pending motions are denied as moot.  The case is terminated.  The parties are to bear their own costs.**
2. **If the plaintiff wishes to appeal this dismissal, he may file a notice of appeal with this court within 30 days of the entry of judgment.  Fed. R. App. P. 4(a).  A motion for leave to appeal *in forma pauperis* should set forth the issues the plaintiff plans to present on appeal.  *See* Fed. R. App. P. 24(a)(1)(C).  If the plaintiff does choose to appeal, he will be liable for the appellate filing fee irrespective of the outcome of the appeal.  Furthermore, if the appeal is found to be non-meritorious, the plaintiff may also accumulate another strike under 28 U.S.C. 1915(g). The plaintiff is advised that the appellate filing fee is currently $455.00.**

**Enter this 18th  day of October 2006.**

s\Harold A. Baker

_____
**Harold A. Baker
United States District Judge**